## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

RAFAEL CHIKVASHVILI,        *

    Petitioner,         *
                       Criminal No. JKB-14-423
    v.                *

UNITED STATES OF AMERICA    *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MOTION TO VACATE OR CORRECT ILLEGAL SENTENCE

Petitioner Rafael Chikvashvili, through his attorney, C. Justin Brown, Brown Law, hereby moves this Honorable Court, pursuant to 28 U.S.C. §2255, to vacate or correct his illegal sentence. Chikvashvili, 72, currently resides at F.C.I. Miami, a medium security prison, and is serving a 120-month sentence.

This Motion is based on multiple claims of ineffective assistance of counsel. Specifically, trial counsel permitted the Government to ask four of Chikvashvili's six character witnesses guilt-assuming hypotheticals without objection. Trial counsel also failed to challenge the Government's claim that Chikvashvili's conduct was the but-for cause of death of two elderly patients, M.V.K. and D.M.C.[1] Counsel was further deficient by selecting the wrong type of medical expert and then inadequately preparing her to challenge the Government's primary expert, Dr. Philip Buescher. Lastly, counsel was

---

[1] The two patients referenced in Counts 2 and 3 are referred to by their initials: M.V.K. and D.M.C.

ineffective for failing to prepare one of Chikvashvili's character witnesses, Dr. Scott

Rifkin, to testify.

As a result of these failures, and others described below, Chikvashvili was denied

effective assistance of counsel under the Sixth Amendment and deserves a new trial.

## I. PROCEDURAL HISTORY

On April 9, 2015, a grand jury charged Chikvashvili with the following offenses:

conspiracy to commit wire fraud and health care fraud resulting in death and serious

bodily injury, in violation of 18 U.S.C. § 1349 (Count 1); health care fraud resulting in

serious bodily injury and death, in violation of 18 U.S.C. § 1347 (Counts 2-5); health care

fraud, in violation of 18 U.S.C. § 1347 (Counts 6-12); wire fraud, in violation of 18

U.S.C. § 1343 (Counts 13-20); false statements relating to health care matters, in

violation of 18 U.S.C. § 1035(a)(1) and (a)(2) (Counts 21-31); and aggravated identity

theft, in violation of 18 U.S.C. § 1028A(a)(1) (Counts 32-33).  Chikvashvili retained Ty

Kelly and Jonathan Biran as defense counsel.

The Court conducted a pre-trial hearing on July 9-10, 2015, centered around

various defense attacks on the Government's allegations that the alleged health care fraud

– and the misreading of x-rays – resulted in the deaths of M.V.K. and D.M.C. Pursuant to

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the defense

challenged the Government's proposed expert medical witness, Dr. Buescher, on the

issue of causation of the deaths charged in Counts 2 and 3. The defense also requested

that the Court bifurcate the trial so the jury would decide the defendant's guilt or

innocence on the question of fraud prior to hearing any testimony as to patient deaths.

Finally, Chikvashvili argued that the allegations that fraud caused serious bodily injury and death be struck from Count 1.

The district court issued a pre-trial Memorandum and Order granting in part and denying in part Chikvashvili's motions. The motion to bifurcate was denied, as was the challenge to Dr. Buecher's methodology. The claim that the "resulting in death" proof was insufficient as a matter of law was deferred to an anticipated Rule 29 Motion.

The Court struck two of the Government's death counts, but two remained. On July 23, 2015, consistent with that ruling, the grand jury returned a Second Superseding Indictment that excised "causing serious bodily injury" from Counts 1-5, and removed "causing death" from Counts 4 and 5.

The case proceeded to a jury trial on February 1, 2016, and lasted nine days.[2] Dr. Buescher and 19 other witnesses testified for the Government. At the close of the Government's case, Chikvashvili moved for a judgment of acquittal pursuant to Rule 29, but the motion was denied. The defense called six character witnesses, plus two of the Government's agents, who were recalled to point out inconsistencies in other witnesses' testimony.

The jury returned a verdict of guilty on all 33 counts. A post-trial Motion for Judgment of Acquittal was denied, as was a Motion for New Trial.

On June 15, 2016, the Court sentenced Chikvashvili to a term of 72 months for each of Counts 1 through 20, to run concurrent with each other; 60 months as to each of

---

[2] Chikvashvili waived a jury trial and sought a bench trial, however the Government did not consent.

Counts 21 through 31, to run concurrent with each other and Counts 1-20; 24 months as

to Count 32 to run consecutive to Counts 1-31; and 24 months as to Count 33 to run

consecutive to all other counts, for a total term of 120 months imprisonment.

Chikvashvili filed a timely notice of appeal to the Fourth Circuit Court of Appeals.

In it, he argued that for criminal liability to attach under 18 U.S.C. § 1347, the false

billing – as opposed to the fraudulent scheme as a whole – must be the "but-for" cause of

death. Because the fraudulent bills were not submitted until *after* the deaths of the two

patients, he argued, the appellate court must vacate the "resulting-in-death" convictions.

Chikvashvili used the same reasoning to appeal the district court's denial of his motion

for acquittal and his challenge to the indictment and jury instructions. He also appealed

the admission of Dr. Buescher's expert testimony on causation. On June 9, 2017, the

Fourth Circuit affirmed the district court's judgment.

Chikvashvili filed a petition for writ of certiorari to the United States Supreme

Court, which was denied on December 11, 2017.

This Motion, pursuant to 28 U.S.C. §2255, is timely filed.

## II. FACTS

### a. Background and Introduction

Rafael Chikvashvili founded Alpha Diagnostics ("Alpha") and served as the

company's CEO. Alpha provided portable, on-site diagnostic imaging services, including

x-rays. Many of Alpha's clients were nursing home patients. Typically, an Alpha

technician would travel to the patient's location, perform the requested x-ray, then

transmit the results to a doctor for interpretation. Later, Alpha would submit claims  to

4

Medicare for reimbursement. The case against Chikvashvili arose from allegedly fraudulent misrepresentations in those reimbursement claims, with the core dispute at trial being whether Chikvashvili was responsible for the fraud.

One type of fraud involved submitting claims for x-rays that were never taken. For example, an Alpha employee would take one image of a patient, but Alpha would allegedly submit a claim for two images. A second form of fraud involved submitting claims for transportation costs. An Alpha employee would travel to one location and image several patients during that single trip, but Alpha would falsely claims its driver made separate trips to image each patient individually. Finally, Alpha would submit claims in order to seek reimbursement for a physician's work interpreting (or "reading") x-rays. But, many times, the Government alleged, no actual physician interpreted the x-ray.

The most serious allegations against Chikvashvili pertained to M.V.K. and D.M.C., two elderly women who died shortly after Alpha had taken images of them. M.V.K. was 90 years old with obstructive lung disease from her years as a smoker, high blood pressure, and a background of heart failure. D.M.C. was 92 years old and also had extensive heart problems. The Government's allegations relating to these individuals were without precedent in federal jurisprudence: that the flawed readings of their x-rays by Alpha technicians – rather than radiologists – caused their deaths, and that Chikvashvili was therefore responsible for the deaths.

The Government's evidence at trial fell into two categories: first, health care fraud, and second, deaths resulting from that health care fraud. Defense counsel conceded the

second category and acknowledged the first, but contended that Chikvashvili neither

knew about nor participated in the fraud. The Government argued that Chikvashvili

initiated and supervised this conspiracy in his role as the owner of Alpha.

### b. Pre-trial

The *Daubert* hearing was the first decisive event of trial, and at it, defense counsel

sought to accomplish two things: first, to preclude Dr. Buescher from testifying that the

misread x-rays were the "but-for" causes of death of the two patients at issue in Counts 2

and 3, and second, to bifurcate the trial so that all counts other than the resulting-in-death

counts would be tried first – and that afterwards, if there were a conviction on the fraud

counts, the jury would be presented with the resulting-in-death counts. Dr. Buescher's

testimony was critical to the Government's case because only he could establish that "the

violation result[ed] in death," as required by 18 U.S.C. § 1347(a)(2).

Before Dr. Buescher took the stand, notably, the Court expressed concern with the

Government's use of the fraud statute to pursue the death counts, offering that the

Government had "stretched" the meaning of the statute, which normally should be

construed narrowly. Transcript ("T.") 7/9/15, at 5-6.

At the hearing defense counsel challenged these counts in two ways. First, defense

counsel raised a sufficiency of the evidence challenge, arguing that the Government's

proposed evidence – even if proven – was not legally sufficient to survive a Rule 29

Motion for Judgment of Acquittal. Second, defense counsel raised a *Daubert* challenge to

the testimony of the Government's "resulting in death" expert.

Dr. Buescher was qualified as an expert in internal medicine, pulmonary medicine, and critical care. He based his testimony upon a review of the medical records and x-rays for M.V.K. and D.M.C., along with the x-ray interpretations prepared by Dr. Sanjeev Bhalla, a radiologist who was the Government's other expert witness. T. 7/9/15, at 111-13. Despite not having personally evaluated the patients, the contrary causes of death listed on their death certificates, and the frail health of both nonagenarians, Dr. Buescher claimed he could divine their actual causes of death, and root it back to the failed x-ray reads.

To undercut the Government's expert the defense called Dr. Lone Thanning, a pathologist who, at the time of the hearing, was working as a full-time private medical-legal consultant. Dr. Thanning sought to testify that, because no autopsy had been performed on M.V.K. or D.M.C., no cause of death could be determined. Her testimony was called into question, however, because, unlike Dr. Buescher, she had reviewed neither the actual patient medical records, nor the relevant x-rays that had formed the basis for Dr. Buescher's conclusions. T. 7/10/15, at 322-28.

The Court granted some relief to Chikvashvili and excluded some testimony, but ultimately ruled that the Government's expert could testify as to his opinions on whether Chikvashvili's alleged violations of § 1347 in Counts 2 and 3 were the "but-for" causes of death. Doc. 72, at 2-6 (Memorandum and Order). Furthermore, the Court denied defense counsel's request to bifurcate the proceedings, thereby allowing the Government to present evidence of Chikvashvili's participation in the health care fraud scheme and the alleged deaths in one phase of trial.

### *c.  Motion in Limine to Exclude Family Testimony*

On January 20, 2016, after the Government indicated its intent to call family members of M.V.K. and D.M.C. as witnesses at trial, defense counsel filed a motion *in limine* to exclude their testimony pursuant to Fed. R. Evid. 403. Doc. 120. The Government argued that the family members' testimony would corroborate Dr. Buescher's testimony as to the causes of death. For example, the Government argued that Sally McCann, the daughter of D.M.C., was uniquely positioned to testify that her mother was bleeding abnormally after a routine surgical procedure, thereby helping prove Dr. Buecher's contention that D.M.C. had died of congestive heart failure (which has as a symptom excessive bleeding). Doc. 124, at 3 (Government's Response to Defendant's Motion *in Limine* to Exclude Testimony).

### *d.  Trial*

At trial, the Government's witnesses generally fell into one of four categories: former Alpha employees, medical experts, family members of the victims, and law enforcement investigators. Three former employees, all of whom worked as technicians for Alpha, testified for the Government: Timothy Emeigh, Bert Thamert, and Kevin Basciano.

Defense counsel told the jury in its opening arguments that there was only one disputed issue: whether Chikvashvili was a knowing participant in the schemes undertaken by Timothy Emeigh and others working at Alpha. Defense counsel explained that it would not contest the Government's proof that M.V.K. and D.M.C. died as a result of Emeigh's fraudulent acts. T. 2/2/16, at 52-54.

The Government's first witness was Emeigh, who oversaw the technicians who provided portable services, assigned images and diagnostic results for interpretation, and handled payment for various Alpha expenses, including reimbursement of interpreting physicians. After entering into a cooperation agreement, Emeigh testified that he looked at thousands of x-rays, interpreted them, and then wrote thousands of reports, signing them with a doctor's name that was not his own. All of this, he claimed, was under the direction of Chikvashvili.

Chikvashilli, however, tried to convince the Jury that Emeigh committed these acts on his own, something he had the ability to do in his role as vice president of operations. Defense counsel argued that the Government failed to prove beyond a reasonable doubt that Chikvashvili either had the requisite knowledge or was involved in the conspiracy. T. 2/2/16, at 52-53.

Bert Thamert and Kevin Basciano were x-ray technicians who worked under Emeigh, and each testified under grants of immunity. Like Emeigh, they testified that they authored fraudulent x-ray reports, signing them with the names of physicians when they were not qualified to do so. Further, they claimed that Chikvashvili not only knew about their behavior, but also directed and participated in it. T. 2/3/16, at 201-02; T. 2/4/16, at 185-86.

Brenda Doyle was another former Alpha employee who testified for the Government. Doyle was in charge of billing for the period of time charged in the indictment, but denied knowing that any of the x-ray technicians working for Alpha were writing reports pretending to be doctors. T. 2/8/16, at 237. Doyle testified her role was

limited to submitting false claims to Medicare that related to the transportation billing scheme, and the scheme to seek reimbursement for two x-rays per patient when one was taken. *Id.* at 235-36. She submitted these false claims, she said, with the knowledge and participation of Chikvashvili.

The Government set out proving the "resulting in death" prong of Counts 2 and 3 by calling Dr. Buescher and family members of the alleged victims. Dr. Buescher testified that: (1) the person who interpreted the x-rays for these two patients failed to report evidence of congestive heart failure that was visible on each patient's x-ray; (2) if the person had noted congestive heart failure, it would have caused other unrelated health care professionals down the line who read the report to make different medical choices in the care of those patients; and, (3) if the physician down the line had made different medical decisions, neither patient would have died at the time they did. T. 2/8/16, at 87-89, 92-93, 97-98, 104-06, 120.

Family members of each victim presented highly emotional testimony. Sally McCann testified that she saw her mother's (D.M.C.) bandages changed at the hospital due to bleeding immediately following the surgery. However, despite numerous attempts by the Government, McCann provided no eyewitness testimony about any bleeding occurring while D.M.C. was back at her nursing home, which, according to the Government's proffer in response to Chikvashvili's motion *in limine*, was the reason her testimony was probative. *Id.* at 149; Doc. 172-1, at 9 (Memorandum in Support of Motion for New Trial).

With respect to M.V.K., the Government elicited from her daughter, Sally

Chapman, a substantial amount of personal and medical history. Regarding the pertinent

period of time – the week prior to M.V.K.'s death – Chapman testified that her mother

had a "dry cough" that was "off and on," and was having a hard time staying awake. T.

2/8/16 at 161-62. When she was not sleeping, however, she was alert and did not seem to

have any difficulty breathing. *Id.*

In keeping with its representation during opening statements that it would not

contest the resulting-in-death elements relating to Counts 2 and 3, defense counsel

essentially conducted no cross-examination of Dr. Buescher, and refrained from asking

McCann and Chapman a single question. *Id.* at 151, 163.

The defense case consisted of the testimony of six character witnesses: Sol

Goldstein, Dr. David Golub, Mark Talan, Dr. Scott Rifkin, Marc Terrill and Rabbi

Mitchell Wohlberg. The defense also re-called two of the Government's agents –

primarily for the purpose of showing inconsistencies with the testimony of other

Government witnesses. Defense counsel permitted the Government to ask guilt-assuming

hypotheticals, without objection, to four of the six character witnesses. Dr. Rifkin,

meanwhile, was questioned about his own mother, who had been the subject of an Alpha

x-ray that was allegedly read by a technician, not a radiologist. T. 2/11/16, at 112-15.

The jury found Chikvashvili guilty on all counts of the Second Superseding

Indictment. With respect to Counts 2 and 3, the jury found that the healthcare fraud

scheme resulted in the deaths of M.V.K. and D.M.C. T. 2/17/16, at 56-60.

### *e. Post-Trial*

Chikvashvili sought relief multiple times after trial, and was denied at every turn.

The Court denied his Motion for Judgment of Acquittal following the close of the

Government's case, and did so again – through a written Order – after trial. Chikvashvili

then filed a Motion for New Trial, contending that the trial court committed legal error by

not bifurcating the trial. Defense counsel claimed that, by denying their request for

bifurcation, the Court had forced them

> to make a choice between the lesser of two evils: (1) contest the
> Government's evidence that the alleged health care fraud scheme
> resulted in the deaths of M.V.K. and D.MC. and thereby play into
> the Government's hands by keeping the focus on the strict liability
> element of Counts Two and Three that had nothing to do with Mr.
> Chikvashvili's knowledge and intent; or (2) elect not to contest the
> resulting-in-death element, virtually ensuring that the Government's
> proof regarding that element would be accepted by the jury.

Doc. 172-1, at 1 (Memorandum in Support of Motion for New Trial).

In denying the Motion, the Court (1) disagreed that it had acted in error by not

bifurcating the trial, and (2) took no responsibility for defense counsel's trial strategy.

The Court stated that Chikvashvili could have argued each defense in the alternative –

what it described as "a common tactic when trying to persuade a factfinder" and one that

"the Court is familiar with…and has not been persuaded that Chikvashvili could not have

employed…" Doc. 196, at 5 (Memorandum and Order).

### III. LEGAL STANDARD

Courts evaluate claims of ineffective assistance of counsel by applying the two-

part test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668

(1984). *Strickland* requires that a petitioner first establish that his trial attorney performed

deficiently by committing an unreasonable error. *Id.* at 687. The reasonableness of the

attorney's performance is to be measured against the "prevailing norms of practice." *Id.*

at 689; *Wiggins v. Smith*, 539 U.S. 510, 522 (2003).

*Strickland*'s second prong requires that the petitioner establish that his trial

attorney's deficient conduct prejudiced the defense. 466 U.S. at 689. To establish

prejudice, the petitioner must show that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different."

*Id*. at 694. *Strickland* defines a reasonable probability as "a probability sufficient to

undermine confidence in the outcome." *Id*. This standard of proof is *less than*

preponderance of the evidence. *Id.* at 693 ("We believe that a petitioner need not show

that counsel's deficient performance more likely than not altered the outcome [.]").

Critically, all criminal defendants are equally entitled to effective assistance of

counsel under the Sixth Amendment – regardless of actual guilt or innocence.

*Kimmelman v. Morrison*, 477 U.S. 365, 380 (1986) ("[W]e" have never intimated that the

right to counsel is conditioned upon actual innocence. The constitutional rights of

criminal defendants are granted to the innocent and the guilty alike.").

### IV. ARGUMENT

**1. Trial counsel were ineffective for permitting the Government to cross-
examine defense character witnesses with guilt-assuming hypothetical
questions.**

Trial counsel were constitutionally ineffective when they permitted the

Government to cross-examine four of Chikvashvili's six character witnesses with guilt-

assuming hypothetical questions. These lines of questioning – flagrant reversible error –

undermined Chikvashvili's presumption of innocence, eviscerated his defense case, and caused the trial to be fundamentally unfair.

There is no dispute that, in the Fourth Circuit, the Government is prohibited from cross-examining defense character witnesses using guilt-assuming hypotheticals. In addition to running afoul of Federal Rule of Evidence 405(a), such questioning violates "a basic concept of our justice system, the presumption of innocence." *U.S. v. Mason*, 993 F.2d 406, 409 (4th Cir. 1993); *see also U.S. v. Siers*, 873 F.2d 747 (4th Cir. 1989) ("We further agree that the 'questions put have no place in a criminal trial.'") (citing to *U.S. v. Candelaria-Gonzalez*, 547 F.2d 291, 294 (5th Cir. 1997)).

While Federal Rule of Evidence 405(a) permits on cross-examination "an inquiry into relevant specific instances of the person's conduct," that inquiry has limitations. As explained in the Advisory Committee Notes to the Rule, "The theory is that, since the reputation witness relates what he has heard, the inquiry tends to shed light on the accuracy of his hearing and reporting." But, guilt-assuming hypothetical questions are "neither an inquiry into specific instances testing the witnesses' knowledge nor exposure of the witnesses' bias as contemplated by the Federal Rules." *United States v. Williams*, 738 F.2d 172, 177 (7th Cir. 1984). Rather, "the questioning allow[s] the prosecution to foist its theory of the case repeatedly on the jury and to force an unsuspecting witness to speculate on the effect of a possible conviction." *Id*.

Here, Government counsel cross-examined four of six defense character witnesses with this impermissible line of questioning. Chikvashvili's attorneys, meanwhile, did nothing to stop the repeated constitutional violations. They did not object even once.

First, the Government improperly cross-examined 93-year-old Sol Goldstein, a World War II veteran who had helped Chikvashvili emigrate from the Soviet Union. Goldstein, on direct, opined that Chikvashvili was an "upstanding citizen" and an "honest person." T. 2/11/16, at 191. Then, on cross, the following ensued:

Q:     You gave an opinion before. Would it change your opinion if you learned that Mr. Chikvashvili had been involved in committing health care fraud for 16 years?

A:     I'd be absolutely flabbergasted. I – and I don't believe that. I don't believe it.

Q:     No I understand that Mr. Goldstein. I understand it would be hard to imagine. But if that were in fact the case, would that change your opinion?

A:     That's supposition – I don't know. That whole concept is so foreign to me. I can't respond to that.

Id. at 193.

The defense's second character witness was Dr. David Golub, a radiologist with whom Chikvashvili had worked since he formed Alpha Diagnostics. Dr. Golub testified that Chikvashvili was law abiding, "compassionate, caring, and trustworthy." Id. at 211. Then, on cross, the Government questioned Dr. Golub about conversations he had with Chikvashvili's attorney:

Q:     Did [the defense attorney] tell you that among other crimes, that Mr. Chikvashvili is charged with having technicians do interpretations of x-rays as opposed to sending them to certified radiologists?

A:     Yes.

Q:     And if that information were true, would that change your opinion as to Mr. Chikvashvili's law abidingness and honesty?

A:     I have to answer that –

Q:     No, sir. I'm asking you a question.

A:     I can't answer yes or no. I'd have to say – unless I'm allowed to answer the
       way I feel, I can't answer that with a yes or no.

Q:     Well, we've already heard how you feel about Mr. Chikvashvili, what I
       asked you was, if that information was correct, that he did that, would it
       change your opinion as to his honesty, his trustworthiness, his law
       abidingness?

A:     No.

*Id.* at 221.

      The defense's third character witness was Dr. Mark Talan, who was a long-time
family friend whom Chikvashvili had helped settle in the United States. Dr. Talan, for
whom English was not his first language, testified that Chikvashvili was "one of the most
trusted people, if not the most trusted" in his community. *Id.* at 226. On cross, the
Government repeated the same improper line of questioning:

Q:     Right. If he did, in fact – I'm going to ask you to assume this – if he did, in
       fact, defraud the government out of a ridiculous amount of money, would
       that change your opinion of his character?

A:     That's a tough question. Because you have to define proof. I have to accept
       this proof. Because I cannot see him this way. Everybody can make a
       mistake, one or two mistake. Systematic action, to defraud the government,
       this is not a person I know.

Q:     If you saw that kind of proof, would your opinion change?

A:     If I will accept this proof. But I have to accept this. Because in my line of
       work – and I review a lot of scientific paper, if you presented data which
       completely turning your understanding of something, you want to look on
       the method, how is this corrected, and see whether you can accept this data.

16

So far, very few thing can convince me that he can do what he was accused of doing.

*Id.* at 231.

Finally, a fourth character witness, Dr. Scott Rifkin, testified that, among other things, he had worked professionally with Alpha Diagnostics, and they provided high quality service. Then, in a surprise cross-examination, the Government attempted to show that Rifkin's mother had actually been defrauded by Chikvashvili's company, in that one of her x-rays was allegedly read by a technician, not a radiologist. After this attack, the Government launched into yet another series of impermissible guilt-assuming hypotheticals:

> Q:     Dr. Rifkin, would it make any difference in your opinion as to the quality of services provided by Alpha Diagnostics if you were to learn that the minus sign in that particular column in front of an initial or initials indicated that, in fact, the radiologic service had not been provided by a radiologist, but instead a technician?
>
> A:     I'd want to know more about this whole situation. You've put something out in front of me for dramatic purposes, my mother. And you haven't shown me the whole situation here. I didn't sit through this whole trial.
>
> Q:     Well, let me put it this way then. Would it make any difference to you in your opinion as to the quality of the service provided by Alpha Diagnostics if you learned that instead of radiologists, x-ray technicians were performing the reads on x-rays?
>
> A:     I would want every patient to be read by a radiologist, sure.
>
> Q:     Do you – is it hard for you to answer my question as to whether it would cause you to change your opinion as to the quality of Alpha Diagnostic's care?

A:     I worked with them for 20-some years. I'd love to know more about that, but I would want every patient to get an x-ray by radiologists. If my patients weren't getting x-rays read by radiologists, that would bother me, sure. Of course it would.

Q:     Just one other question, doctor. If you learned that that's how Rafael Chikvashvili was running his business, having technicians instead of radiologists do interpretations, would that change your opinion as to his law abidingness?

A:     I'm not – I'm not going to define what law abiding is. I would want all my patients to get x-rays read by radiologists, of course.

*Id.* at 114-15.

Counsel's performance here – in failing to object as the Government improperly questioned <u>four</u> witnesses – fell below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 688 (1984) (requiring proof of deficiency and prejudice in order to show ineffective assistance of counsel). By not objecting, trial counsel permitted the Government to (1) undermine the credibility of four out of six of its character witnesses and (2) weaken the constitutional requirement of a presumption of innocence. Defense counsel neglected their duty to "render the trial a reliable adversarial testing process." *Id*. at 688.

There was nothing – nor could there be anything – strategic about this. *See U.S. v. Rusmisel*, 716 F.2d 301, 310 (5th Cir. 1983) (finding ineffective assistance of counsel for failure to object to improper Government questions, and rejecting an explanation that it was trial strategy). Even if counsel strategically did not want to object to the questions in front of the Jury, that strategy would not apply to the second, third and fourth times the

Government asked the same highly prejudicial, improper questions. If that were the strategy, counsel could have raised the issue at the bench prior to subsequent witnesses.

Counsel's repeated failure to object prejudiced Chikvashvili in multiple ways. First, the Government used these questions to destroy the credibility of Chikvashvili's character witnesses – who comprised nearly the totality of his defense case. These witnesses were particularly critical because the broader defense strategy was to argue that, although wrongdoing occurred, Chikvashvili was unaware of it. This strategy required that the Jury trust the good character and truthfulness of Chikvashvili. Without these witnesses, Chikvashvili did not have a chance.

The Government's questions forced the witnesses to make an impossible choice – and in so doing unfairly impinged *their* credibility. The character witnesses either had to accept the Government's hypothetical and flip-flop their own opinion as to Chikvashvili's character, or they had to stake out the untenable position of accepting the hypotheticals while denying that it would affect their opinions. A third option was to try to avoid answering the question, which would only make the witnesses look evasive.

Making matters worse, the questions were asked in a manner that goaded the witnesses. The Government asked Dr. Talan, who obviously struggled to understand certain nuances of the English language, to assume that Chikvashvili had defrauded the Government of a "ridiculous" amount of money.[3] T. 2/11/16, at 231. With Dr. Rifkin, the Government brought into play the sensitive topic of the witness' mother and then, after

---

[3] This was apparently an attempt to play off of Dr. Talan's earlier use of the word "ridiculous."

posing an impossible guilt-assuming hypothetical, gratuitously asked him "is it hard for you to answer my question?" *Id.* at 115. Meanwhile, when the Government asked Sol Goldstein, age 93, to assume Chikvashvili had been committing fraud for 16 years, and when Goldstein expressed disbelief, the Government patronizingly commented, "I understand it would be hard to imagine. But if that were in fact the case, would that change your opinion?" *Id.* at 193.

The overall effect of these questions was to turn Chikvashvili's own witnesses into liabilities. While this is what trial lawyers are supposed to do, they are not supposed to do so by improper means. *See* ABA Criminal Justice Standards for the Prosecution Function, Standard 3-6.7(a) ("The prosecutor should conduct the examination of witnesses fairly and with due regard for dignity and legitimate privacy concerns, and without seeking to intimidate or humiliate a witness unnecessarily.")

These witnesses were of paramount importance to the defense case, and their evisceration sank the defense's best chance of winning the trial. The importance of these witnesses can be demonstrated by the emphasis the Government placed on them during closing arguments. *See Kyles v. Whitley*, 514 U.S. 419, 445 (1995) (measuring prejudice by "taking the word of the prosecutor" at closing argument). Here, in closing arguments, the Government discussed these witnesses more than a half dozen times, at significant length. Prosecutors even ridiculed these character witnesses, and attempted to turn them against Chikvashvili in part because of their inability to answer the improper guilt-assuming hypotheticals. The Government argued the following in rebuttal:

Now, as I mentioned, the character witnesses, there are some real limitations on the utility of their testimony. As indicated, most of them had a very limited association or at least the context in which they associated with Rafael Chikvashvili was very limited. And it skewed their appreciation of his complete character.

Virtually all, at least those to whom we put the question, didn't want to accept the proposition that they might have been wrong. Now, none of us would like to think that, you know, our best friend could be some sort of heinous criminal. But if somebody told us, as a fact, except [sic] that it is ground truth, that it is a fact, we might have to reassess our opinion of him. We might still love our best friend, you know, those things don't change, it's like a family member. But you at least might have to reassess your evaluation of the individual's character. And the fact that the witnesses just resisted that would suggest that some, if not all of them, came with an agenda.

Sweet Dr. Golub, let me just say one thing about him…

T. 2/16/16, at 135-36.

In addition to hobbling the defense case, the Government's use of impermissible questions, and defense counsel's failure to object, caused the ultimate constitutional harm of negating the defendant's presumption of innocence. This was done repeatedly, through nearly the entirely of the defense's case, in clear view of the jury. It was as if the Government were following the adage that, if you repeat something enough, it must be true. This tactic had the effect of making the trial unfair.

It is arguable that there is nothing more foundational to our criminal justice system than the presumption of innocence – "that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" *In re Winship*, 397 U.S. 358, 363 (1970) (quoting *Coffin v. United States*, 156 U.S. 432, 453

(1895)). The questions posed by the Government in this case crossed that constitutional line rooted in due process. As the Fifth Circuit explained 40 years ago, "These hypothetical questions struck at the very heart of the presumption of innocence which is fundamental to Anglo-Saxon concepts of fair trial. We think that the risk of prejudice to defendant's basic rights from such questions requires reversal. The questions put have no place in a criminal trial." *United States v. Candelaria-Gonzalez*, 547 F.2d 291, 294 (5th Cir. 1977) (internal citations omitted) (cited approvingly in *United States v. Mason*, 993 F.2d 406 (4th Cir. 1993)).

The effect of this was magnified here because of the repetition, timing and manner of the Government's assault. The brevity of the defense case meant that every character witness carried great weight. While the Government case spanned nine days, the defense case was condensed into a day and a half. As a result, it is likely that the jury became more focused and interested in this part of the trial; finally it was the defendant's opportunity to answer the charges. And rather than talk about the type of person Chikvashvili was, the defense witnesses were forced to do something entirely different. They were forced to assume his criminal conduct; assume 16 years of fraud; assume he stole a "ridiculous" amount of money. This is the testimony, at the end of trial, that the jury took to the deliberation room. It was the very rejection of the presumption of innocence, told through Chikvashvili's best friends.

Because counsel was deficient in failing to object to the Government's improper guilt-assuming hypotheticals, and because prejudice ensued, the Court must grant Chikvashvili a new trial on this issue alone.

**2. Trial counsel were ineffective for selecting the wrong kind of medical expert, and then failing to adequately prepare her, in advance of the *Daubert* hearing.**

At the *Daubert* hearing defense counsel made two significant errors, both of which constituted ineffective assistance of counsel. First, counsel chose the wrong type of medical expert to challenge the Government's principal expert. Second, after making this improper selection, counsel failed to adequately prepare their own witness to testify. Had defense counsel used the correct type of medical expert, and prepared her properly, there is a reasonable probability that the outcome of the proceeding would have been different.

### *a. Trial counsel selected the wrong kind of medical expert.*

As medically qualified as Chikvashvili's expert, Dr. Lone Thanning, may have been as a forensic pathologist, in this case her background left her completely unable to rebut the Government's primary expert. She was the wrong kind of expert entirely – a fact she openly acknowledged during the *Daubert* hearing – and she was unable to speak the same medical language as Dr. Buescher, whose testimony she was there to attack. *See* Ex. 1 (Affidavit of Dr. Alan Kimmel).

Dr. Buescher was critical to proving the Government's resulting-in-death charges because only he could establish the necessary link between the failed x-ray reads and the deaths of M.V.K. and D.M.V.

His experience and qualifications were extensive: he was the director of the critical care unit at both Union Memorial Hospital and Good Samaritan Hospital; he was a member of the medical faculty at Johns Hopkins; he routinely saw and diagnosed critically ill elderly patients; and he routinely used x-rays, among other tests, to make

diagnoses. In addition, Dr. Buescher was frequently asked to reach conclusions as to causes of death through twice-monthly mortality and morbidity conferences. The district court qualified him as an expert in internal medicine, pulmonary medicine, and critical care. T. 2/8/16, at 62-76.

Yet, despite the depth of Dr. Buescher's qualifications, he still faced the steep challenge of trying to prove the Government's novel claim that bad x-ray reads caused two deaths. Both of the "victims" were in their 90s and suffered from myriad health problems. Dr. Buescher's conclusions contradicted the causes of death listed on both death certificates. And, at a very fundamental level, Dr. Buescher was trying to convince the Court that a radiologist should have made a diagnosis that was, essentially, within the purview of a cardiologist. *See infra* Issue 3, section (b).

It was in this context that the defense called Dr. Lone Thanning, a board-certified pathologist. Her role in the pretrial hearing, in the words of the Court, was to "support [the defense's] position, attacking whether or not the Government's witness should be permitted to testify." T. 7/9/15, at 237-38.

Despite the broad purpose of Dr. Thanning's role, her testimony was narrow. Dr. Thanning spent almost the entirety of her testimony attempting to establish a single point: that without an autopsy – and none was performed on either patient – it was impossible to determine a "but-for" cause of death.

Aside from her opinion as to the necessity of an autopsy, Dr. Thanning was simply unable to rebut Dr. Buescher's testimony in any meaningful way. She claimed no experience treating living persons, so she could not testify about causation issues and

whether the failed x-ray reads were in fact to blame for the patients' deaths. Nor could

she testify about other preexisting conditions that could have caused the deaths. She had

no experience in any of the areas that made Dr. Buescher a successful expert: critical

care, cardiology, mortality and morbidity, etc. She did not even have the expertise

necessary to review the x-rays in question, and determine the extent to which they

presented warning signs of congestive heart failure. As she summarized, in her own

words, "I'm not here to diagnose x-rays. I'm not here to testify as to quality of care." T.

7/10/15, at 329. Yet that was precisely what the defense needed to counter Dr. Buescher.

When Dr. Thanning was cross-examined, the Government easily undermined her

methodology and highlighted the failure of defense counsel to prepare her. Eventually, it

became apparent that she did not even view herself to be an expert on the same plane as

Dr. Buescher:

> Q:     But how can you say that if you didn't review the medical records? How
>        can you say they weren't sufficient, Dr. Buescher's opinions weren't
>        sufficient, if you didn't review the very same body of evidence he
>        reviewed?
>
> A:     Because I am not Dr. Buescher's opponent here, expert opponent. I'm a
>        pathologist, forensic pathologist. He's a – an internist and pulmonoligist, et
>        cetera. I am not here to oppose his statements or his testimony.
>
> Q:     So I still don't understand, then, what you're here for.

T. 7/10/15, at 328.

Because Dr. Thanning's medical background rendered her unable to challenge Dr.

Buescher in any meaningful way, the selection of her as the sole defense expert at the

*Daubert* hearing was objectively unreasonable and it qualifies as deficiency under the first prong of *Strickland v. Washington*.

### b. Trial counsel inadequately prepared their own expert witness.

Trial counsel's second misstep at the *Daubert* hearing was their failure to adequately prepare Dr. Thanning. This happened in two ways. First, they allowed her to build her testimony on an incomplete examination of the medical files – files that Dr. Buescher *had* examined and on which he had formed his opinion. Second, they allowed her to apply the incorrect legal standard, leaving her repeatedly exposed on cross-examination. The two failures worked hand-in-hand: because she didn't review the medical files, she was unable to apply the correct legal standard, and the weight of her testimony suffered mightily as a result.

The Government had no such problems. Dr. Buescher formed his opinion after a complete analysis of each patient's hospital file, along with a legally sound understanding of "but for" causation. As to D.M.C., Dr. Buescher reviewed the x-ray image and testified that it showed evidence of congestive heart failure, despite the x-ray report issued by Alpha saying "no CHF." Dr. Buescher opined that if the x-ray report had been correct, the physician who later read the report would not have approved D.M.C. for surgery. He testified that "but for" the error reading the x-ray, surgery would not have been approved, and if there had been no surgery, D.M.C. would not have experienced the bleeding which he believed led to her death. T. 7/9/15, at 115-25.

As to M.V.K., Dr. Buescher also testified that her x-ray report did not identify congestive heart failure. After reviewing the image, however, Dr. Buescher testified that

the x-ray showed evidence of congestive heart failure and opined that if the x-ray report had correctly identified it, staff at the nursing home would have transferred M.V.K. to a higher level of care for closer monitoring. Had she been transferred, Dr. Buescher said, she would have lived longer. As such, Dr. Buescher opined that the x-ray misread was the "but-for" cause of her death. T. 7/9/15, at 125-30.

Dr. Thanning's testimony, however, could arrive at no other conclusion than the ones she kept returning to – that medical records are inherently unreliable, that autopsies are necessary to confirm causes of death, and that Dr. Buescher was unprepared – because she had not reviewed the patients' actual medical records. T. 7/10/15, at 323-25, 328, 331. Exacerbating her lack of preparation, she also had not reviewed the relevant x-rays that had formed the basis for Dr. Buescher's conclusions. *Id*. at 323, 325, 327.

Because Dr. Thanning had not reviewed the same medical records as Dr. Buescher, her testimony suffered in three ways. First, even though she testified that "medical records are inherently unreliable," she had no basis to testify that the medical records *in question* were unreliable:

Q:      Well, but I need – my question is you – it is not your testimony, despite the fact that you've opined that medical records are inherently unreliable, it is not your testimony that any of the medical records that were actually relied upon by Dr. Buescher contained any inaccuracies or were unreliable in any way? You can't testify to that, can you?

A:      I don't know, I haven't read the records.

*Id.* at 332-33.

Second, because she had not reviewed the same body of evidence that Dr.

Buescher did, she had no medical basis to challenge his methodology. Instead she tried to

fault him for *his* lack of preparation:

> Q:     So your opinion goes to his level of preparation for court, that that's the
>        basis for concluding his method is unreliable, because, in your view, he
>        should have been better prepared for court?
>
> A:     That's not the only reason.
>
> Q:     Well, then what is – what are the – what is the other reason for why you
>        think his method is unreliable if you haven't reviewed the evidence he
>        reviewed?
>
> A:     It is the – the striking lack of foundation I heard for several hours yesterday
>        that clearly shows a lack of diligence in – in considering what caused these
>        patients' deaths before rendering such, in my opinion, opinionated
>        testimony regarding those matters in such a serious claim as is this – or
>        these four.
>
> Q:     Well, how can you give an opinion as to his diligence if you haven't
>        reviewed the records he reviewed?

*Id.* at 330.

Third, her lack of preparation left her unable to understand, explain, and apply the

correct "but-for" legal standard. When asked to describe the "but-for" standard upon

which she was basing her opinion, she referenced "current Supreme Court case law" that

was "self-explanatory," though she was "not referring to a particular case." *Id.* at 321.

When pressed on it, she deferred to defense counsel, and repeatedly failed to produce an

answer. *Id.* at 322.

Through no fault of her own, Dr. Thanning was put in an impossible situation. She was hired to oppose a doctor whom she was not qualified to oppose, and she was asked to do so without a sound factual and legal background. Her selection as the defense's expert witness, therefore, was objectively unreasonable.

### c. Prejudice

Both of trial counsel's failures at the *Daubert* hearing – selecting the wrong kind of expert, then failing to prepare her – proved to be prejudicial to Chikvashvili's case. This was a case in which the Government was attempting to break new legal ground with a hypothesis that was facially doubtful. While the Government had an expert with a blue-ribbon C.V., the causal link it sought to establish was vulnerable to almost any meaningful challenge.

Even the Court seemed to cast doubt on Dr. Buescher's claim that he could divine a but-for cause of death under the circumstances, in which any number of factors could have caused the deaths of the ill patients in their 90s. After observing that "it seems to me that some disease process or aging caused the injury," the Court went on to remark that "[c]riminal statutes are to be construed narrowly. It strikes me that the Government has really stretched here." T. 7/9/15, at 5-6.

Had the correct expert been chosen, one that had the ability to speak the same medical language as Dr. Buescher, and had that witness prepared by reading the relevant medical files, there is reasonable probability that the outcome of this proceeding would have been different.

**3. Trial counsel's decision not to challenge the two "resulting-in-death" charges was not objectively reasonable.**

Defense counsel were ineffective when they failed to challenge the most serious charges against Chikvashvili – both "resulting-in-death" counts – over his objection. Instead of challenging the Government's primary expert on a number of contestable issues, trial counsel instead opted to sit on their hands and remain silent. Had counsel chosen any number of alternate viable tactics – one of which the Court pointed out – there is a reasonable probability that the outcome of Chikvashvili's trial would have been different.

### a. Deficiency

Defense counsel's approach was constitutionally deficient for two reasons. First, by believing that their *only* options were to either contest the "resulting-in-death" counts or remain silent, counsel created a false binary choice that prevented them from selecting a more reasonable strategy: arguing in the alternative. Second, their decision to do so overrode Chikvashvili's desire – and right – to challenge the *actus reus* elements of the crimes the Government had charged.

### i. Failing to argue in the alternative

Counsel unreasonably believed that, by denying their motion to bifurcate Chikvashvili's trial, the Court had forced them into one of only two corners. They now had

> to make a choice between the lesser of two evils: (1) contest
> the Government's evidence that the alleged health care fraud
> scheme resulted in the deaths of M.V.K. and D.MC. and
> thereby play into the Government's hands by keeping the

focus on the strict liability element of Counts Two and Three
that had nothing to do with Mr. Chikvashvili's knowledge
and intent; or (2) elect not to contest the resulting-in-death
element, virtually ensuring that the Government's proof
regarding that element would be accepted by the jury.

Doc. 172-1, at 1 (Memorandum in Support of Motion for New Trial).

The Court, however, correctly rejected the idea that it should have bifurcated the

trial, and took no responsibility for defense counsel's flawed trial strategy. In fact, the

Court explicitly provided a way in which trial counsel *could* have challenged the

Government without harming the central elements of their defense. Chikvashvili could

have argued each defense in the alternative – what the Court described as "a common

tactic when trying to persuade a factfinder" and one that "the Court is familiar with…and

has not been persuaded that Chikvashvili could not have employed…" Doc. 196, at 5

(Memorandum and Order).

During their closing arguments, trial counsel appeared to realize their strategic

error, and tried a last-minute course-correction, making *their only* attempt to challenge

Dr. Buescher's testimony in front of the Jury. After reiterating the argument they had

made during trial, defense counsel then proposed an alternative – one they could have,

and should have, made earlier with Dr. Buescher on the stand:

You many have noticed that Dr. Buescher, when he
testified about M.V.K., he testified that she died a sudden
death. And based – for that – on that, he relied on nursing
notes. And he said, "I looked at these nursing notes and she
died a sudden death."
After he said that she died a sudden death, and your
recollection controls, but at least two times he said the phrase,
"it was most likely heart failure." It could have been a stroke.
He testified it could have been a stroke, but it was most likely

> heart failure. You will get an instruction at the end of this
> case about the but for cause of death. And when you read that
> instruction, what most likely happened is not but for.

T. 2/16/16, at 107.

The Government – apparently surprised at the on-the-fly change in defense

strategy – brought it to the attention of the Jury in their rebuttal:

> Now to the extent that the defense suggested in
> opening and suggested in closing that there were matters that
> are – they don't agree with – even though they said there's no
> dispute as to the cause of death – what did [defense counsel]
> do after she said that? She then launched into a short
> challenge of Dr. Buescher's account as to the death of one of
> the patients. So you know, is it a red herring or not?

*Id.* at 129.

Defense counsel's last-second effort to undercut Dr. Buescher's credibility

emphasized the deficiency of their decision not to do it earlier. It was, however, too little

too late.

### ii.   Undermining Chikvashvili's desire and right to contest his guilt

By failing to challenge Dr. Buescher, defense counsel also undermined both the

desire and right of Chikvashvili to contest his guilt regarding the most serious charges

against him, the but-for death counts. *See* Ex. 2 (Chikvashvili Affidavit).

It is well established that a defendant need not entirely surrender control of his

case to counsel. "The Sixth Amendment does not provide merely that a defense shall be

made for the accused; it grants to the accused personally the right to make his defense."

*Faretta v. California,* 422 U.S. 806, 819 (1975). Further, it "speaks of the 'assistance' of

counsel, and an assistant, however expert, is still an assistant." *Id.* at 820. When a client

expressly asserts that the objective of his defense is to maintain innocence of the charged

criminal acts, his lawyer must abide by that objective and may not override it by

conceding guilt. *See* ABA Model Rule of Professional Conduct 1.2(a) (2016) (a "lawyer

shall abide by a client's decisions concerning the objectives of the representation").

Presented with express statements of the client's will to maintain innocence, counsel may

not steer the ship the other way. *See Gonzalez v. United States,* 553 U.S. 242, 254 (Scalia,

J., concurring in judgment) ("[A]ction taken by counsel over his client's objection…ha[s]

the effect of revoking [counsel's] agency with respect to the action in question.").

In a recent case – pertaining to concessions of guilt in cases potentially resulting in

the death penalty – the Supreme Court tackled a more extreme version of the question

Chikvashvili raises here: whether defense counsel can concede guilt over the objection of

their client. Ultimately, the Court held that "a defendant has the right to insist that

counsel refrain from admitting guilt, regardless of counsel's experience-based view of the

merits of confessing guilt." *McCoy v. Louisiana,* 138 S. Ct. 1500, 1505 (2018)

(distinguishing *Florida v. Nixon,* 543 U.S. 175 (2004), which held that when counsel

confers with the defendant and the defendant remains silent, neither approving nor

protesting counsel's proposed concession strategy, "[no] blanket rule demand[s] the

defendant's explicit consent" to implementation of that strategy. *Id.* at 192.) This means

that while defense counsel may use professional judgment to develop defense theories

and trial strategies based on their assessment of the evidence, they cannot usurp the

fundamental choices provided directly to a criminal defendant under the Sixth

Amendment: choosing the objective of his defense. *See also Gannett Co. v.*

*DePasquale,* 443 U.S. 368, 382, n. 10 (1979) (the Sixth Amendment "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense").

Here, Chikvashvili wanted to challenge the *actus reus* of the but-for death counts. *See* Ex. 2 (Chikvashvili Affidavit). Consistent with what the Court said, it *was* possible to do this while at the same time pinning the blame on Emeigh and the other Alpha employees. This defense in the alternative was logical and viable. The Government's biggest challenge was linking the misread x-rays to the actual deaths of M.V.K. and D.M.C. Counsel had to have seen this weakness in the Government's case, and they should have capitalized on it. While counsel did profess a strategic reason for not pursing this, that strategy was flawed because the two defenses were not mutually exclusive.[4] As *Strickland v. Washington* explains, strategic choices are reasonable only to the extent that they are "informed strategic choices." 466 U.S. 668, 691 (1984). This decision was not.

Here, defense counsel made their chosen path – silence – clear from the outset. At the end of opening statements they listed the number of issues Chikvashvili was *not* disputing, and most serious of these were the two counts of health care fraud resulting in death. T. 2/2/18, at 53. Later, they provided their rationale for doing so, blaming the Court's failure to bifurcate the trial as the reason that "the defense then essentially sat on its hands as the government put on inadequate evidence as to but-for causation regarding M.V.K.'s death, and irrelevant and prejudicial family member evidence as to both

_____

[4] Their reason, specifically, was "to ensure that the jury fully and fairly considers the evidence concerning Mr. Chikvashvili's alleged unlawful acts without being inflamed by allegations of what happened to several patients after Mr. Chikvashvili allegedly committed his unlawful acts." Doc 48-1, at 1 (Memorandum in Support of Motion to Bifurcate Trial).

M.V.K. and D.MC." Doc. 172-1, at 2 (Memorandum in Support of Motion for New

Trial). Importantly, they were *well aware* of the consequences of their decision, noting

that their "Elect[ing] not to contest the resulting-in-death element, virtually ensur[ed] that

the Government's proof regarding that element would be accepted by the jury." *Id.* at 1.

They were right.

### b. *Prejudice*

The decision not to contest Chikvashvili's guilt as to the resulting-in-death charges

proved to be prejudicial. Trial counsel's error, while not rising to the level in *McCoy*, was

just as damaging to Chikvashvili – a point the Government made clear in their closing

argument:

> And that's the only testimony, at least, that went
> unchallenged. The defense didn't challenge that testimony of
> Dr. Bhalla or Dr. Buescher on the conclusion that the health
> care fraud caused their deaths. So, if you conclude that the
> defendant engaged in health care fraud, then his conduct
> resulted in the deaths of those two women.

T. 2/16/16, at 48.

By opting to sit on their hands and not challenge Dr. Buescher, trial counsel turned

away the opportunity to undercut the very testimony that proved to be the most harmful

to Chikvashvili. And the opportunity was ripe, as the biggest challenge the Government

faced was proving the link between the misread x-rays and the deaths of M.V.K. and

D.M.C.

There were multiple problems with the Government's theory. First, there did not

exist 100 percent certainty that a radiologist would have spotted the congestive heart

failure that was identified by the Government's witness, Dr. Bhalla, whose reports and opinions Dr. Buescher relied upon. T. 2/8/16, at 78.

Second, both patients were elderly and in frail health. T. 7/9/15, at 98. M.V.K. was living in a nursing home with a background of heart failure, high blood pressure, and obstructive lung disease. T. 2/8/16, at 79-80. D.M.C. also lived in a nursing home and had a history of multiple heart failures that led to the placement of a pacemaker. *Id.* at 99. Her condition was also complicated by the presence of an ulcer on her leg. *Id.* Her litany of medical conditions was so lengthy that, even after an additional x-ray was taken upon her re-admission to Greater Baltimore Medical Center, her system slowly began to shut down. *Id.* at 113.

Third, there were no autopsies performed on the bodies, and both death certificates listed causes of death *other than* what Dr. Buescher claimed. In contrast to Dr. Buescher's opinion regarding each patient's cause of death, M.V.K.'s death certificate listed "advanced chronic obstructive pulmonary disease" whereas D.M.C.'s death certificate listed "sepsis." T. 2/18/16, at 94, 107. As to M.V.K.'s cause of death, Dr. Buescher's finding's were somewhat inconsistent, at one point opining that it could have also been the result of a stroke. T. 2/8/16, at 98. As to D.M.C., Dr. Buescher dismissed sepsis as the cause of death – despite it being listed as such on the death certificate – because he personally knew the treating physician and, "he'll put sepsis down there because that's the way he does it." T. 7/9/15, at 213-16.

These are just a few of the ways the Government's theory would have been vulnerable if defense counsel had hired an appropriate expert and mounted a fulsome

attack on Dr. Buescher's conclusions. Had Chikvashvili been able to successfully defeat

these charges, such a result would have had a profound spillover effect on the rest of the

trial that likely would have resulted in the granting of a new trial.[5]

### 4. Trial counsel were ineffective for their failure to prepare Dr. Scott Rifkin with information they had at their disposal and *should have* been aware of.

Trial counsel were further ineffective because they failed to discover important

information about one of Chikvashvili's key character witnesses, Dr. Scott Rifkin. This

led to their inability to adequately prepare him for cross-examination, and resulted in him

being ambushed by information that defense counsel had at their disposal – information

that had, in fact, been introduced into evidence by the Government. This combination of

failures undermined the testimony of yet another defense witness, as he learned with

surprise on the witness stand that his mother may have received sub-standard medical

attention from Alpha.

Two of defense counsel's primary duties are to investigate and prepare, and the

failure to do so violates an objective standard of reasonableness. *See Strickland v.

Washington*, 466 U.S. 688 (1984) ("In other words, counsel has a duty to make

reasonable investigations or to make a reasonable decision that makes

particular investigations unnecessary.") These duties are cemented in recognized

standards of practice, too. *See* ABA Criminal Justice Standards for the Defense Function,

---

[5] At the *Daubert* hearing, defense counsel raised this very issue: "There's no doubt in my mind that if Your Honor Rule 29s Counts 2 through 5, that we're going to be asking for a mistrial, because no jury can be expected to have listened to the gruesome details of four dying people, all of whom have a dad, a mom, an aunt, an uncle in a nursing home, to just forget all that and let's go back to our garden-variety health care fraud." T. 7/9/15, at 17. The Court agreed: "Well, you can assume that you're right about that." *Id.*

Standard 4-4.6(a) ("Defense counsel should prepare in advance for court proceedings. Adequate preparation…will often include: reviewing available documents; considering what issues are likely to arise and the client's position regarding those issues; how best to present the issues and what solutions might be offered.")

As voluminous as Chikvashvili's file was, defense counsel had a duty to review the discovery. Had they done so, they would have learned in advance what the Government was able to learn, and would have readied their witness for the inevitable line of questioning he faced. When Dr. Rifkin took the stand, he did so as the final character witness called by defense counsel. During cross-examination – directly before he was asked a similar set of guilt-assuming hypothetical questions that discredited three of Chikvashvili's prior witnesses – Dr. Rifkin was asked to identify a patient on one of Alpha's dispatch logs. The log had been introduced into evidence, and after reviewing it, he confirmed that the patient in question was his mother. He then described the standard of care that he expected a patient like her to receive, and was asked if he would be surprised to learn "that, in fact, the radiologic service had not been provided by a radiologist, but instead a technician?" T. 2/11/16, at 114. Dr. Rifkin was unprepared: "I'd want to know more about this whole situation. You've put something out in front of me for dramatic purposes, my mother. And you haven't shown me the whole situation here. I didn't sit through this whole trial." *Id.* at 115.

Defense counsel were ineffective because they should have learned this information in advance, and their failure to do so resulted in their inability to adequately

prepare Dr. Rifkin. Because Dr. Rifkin was not prepared, his credibility – like that of four of six of Chikvashvili's character witnesses – was undermined.

## 5.   Cumulative Error

Each error discussed individually above, when considered cumulatively, requires reversal of Chikvashvili's convictions. "Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Basham,* 561 F.3d 302, 330 (4th Cir. 2009).

Chikvashvili's trial contained numerous reversible errors, most notably (1) trial counsel allowing the Government to repeatedly ask guilt-assuming hypothetical questions to four of six defense witnesses, (2) the multiple instances of ineffective assistance surrounding expert witnesses at the *Daubert* hearing, (3) the failure to prepare for trial one of Chikvashvili's key character witnesses, and (4) the deficient decision not to challenge the "resulting in death" counts. In aggregate, these errors, by a reasonable probability, affected the outcome of the proceeding.

As a result of these multiple failures, Chikvashvili was convicted and sentenced to 10 years imprisonment – a sentence obtained in violation of his constitutional right to effective assistance of counsel and the laws of the United States. It must be vacated.

## V. CONCLUSION

For the reasons described above, Chikvashvili respectfully asks that this Honorable Court grant this Motion and vacate his sentence, reduce his sentence, or grant

Case 1:14-cr-00423-JKB   Document 298   Filed 12/10/18   Page 40 of 40


him any other appropriate remedy to cure the constitutional violations he suffered.

Chikvashvili respectfully requests a hearing on this Motion.


Respectfully Submitted,


_____/s/_____
C. Justin Brown
BROWN LAW
1 North Charles St., Suite 1301
Baltimore, Maryland 21201
Tel: 410-244-5444
Fax: 410-934-3208


**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2018, a copy of this Motion was served on all parties via CM/ECF.


_____/s/_____
C. Justin Brown